UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

...................................................................x

Sheldon P. Johnson,
(B&C # 241-24-00514)                Plaintiff,

-against-

Correctional Officer, Clinton Thomas; C.O. Ceasar
Gonzalez; Sergeant, Thomas Knight; C.O. Thomas Molloy
(Badge #60693); C.O. V. Marisco (formerly John Doe #1);
C.O. Jasmin Soto (Badge #37923)(formerly Jane Doe #2);
C.O. Sheryl Davis (Badge #35619)(formerly Jane Doe #3);
C.O. Jessica Reyes (Badge # 58410) (formerly Jane Doe #4);
Former Deputy Superintendent of Health, Latisha Jackson;
Deputy Superintendent of Administration, Albert Helms;
Former Superintendent, Michael Capra; Senior Offender
Rehabilitation Counselor [SORC], Ms. J. Manuel (Program
Committee Chairperson); Nurse Practitioner, Shibi Kachappily;
Doctor, Felix Ezekwe; Doctor, Frederick Parker; Doctor, Razia
Ferdous; Correctional Sergeant, Mark Larsen.
                                        Defendants.

...................................................................x



24-CV-7639 (CS)

42 USC § 1983

**AMENDED
COMPLAINT**

**JURY TRIAL
REQUESTED**



**I. PARTIES IN THIS COMPLAINT**

1. Plaintiff, Sheldon P. [Preston] Johnson, Book & Case number # 241-24-00514, currently

detained at Riker's Island Correctional Facility, 09-09 Hazen Street (G.R.V.C.), E. Elmhurst New

York, 11370, is proceeding Pro-Se.

2. For all intents and purposes, all allegations stated herein are based upon a previous

incarceration under DIN (Department Identification Number), #99-A-3011, while plaintiff was a

1

ward of the New York State Department of Correctional and Community Supervision (N.Y.S. D.O.C.C.S), and was released from said custody on May 4, 2023.

3. THIS IS AN AMENDED COMPLAINT, pursuant to an Order of United States District Judge, Honorable Cathy Seibel, on March 21, 2025, directing plaintiff to file an 'Amended Complaint' no later than May 27, 2025, adding the names of defendants, Jane/John Doe #1-4, all of which having now been identified for purposes of service are included herein. As well as the inclusion of *Correctional Sergeant, Mark Larsen*, as Defendant #17. In accordance to Federal Rules of Civil Procedure, Rule 15(a).

4. The defendants are represented by The New York State Attorney General's Office, of the State of New York, Assistant Attorney General, Robert Cosgrove Feliu, Westchester Regional Office, 44 South Broadway, 5th Floor, White Plains, New York 10608.

## II. DEFENDANTS IN THIS COMPLAINT

1. Correctional Officer, Clinton Thomas; (*Messhall Officer*) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

2. Correctional Officer, Ceasar Gonzalez (Badge #42401) (*Search Team Officer*); employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

3. Correctional Sergeant, Thomas Knight, (*Messhall Sergeant*) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

4. Correctional Officer, Thomas Molloy (Badge #60693)(*Strip-Search Officer #1*); employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562 ;

2

5. <u>Correctional Officer, V. Marsico</u> (**Formerly John Doe #1**) (*Strip-Search Officer #2*); employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;[1]

6. <u>Correctional Officer, Jasmin Soto</u> (Badge #37923)(**Formerly Jane Doe #2**)(*Movement & Control*) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

7. <u>Correctional Officer, Sheryl Davis</u> (Badge #35619)(**Formerly Jane Doe #3**)(*Movement & Control*) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

8. <u>Correctional Officer, Jessica Reyes</u> (Badge #58410)(**Formerly Jane Doe #4**)(*Movement & Control*) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

9. *Former*, <u>Deputy Superintendent of Health (DSH) at Sing-Sing, Latisha Jackson</u>, currently employed at Fishkill Correctional Facility, 18 Strack Drive, 271 Matteawan Rd., Beacon, New York 12508;

10. <u>Deputy Superintendent of Administration (DSA), Albert Helms</u>; employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

11. *Former* <u>Superintendent of Sing-Sing Correctional Facility, Michael Capra</u>; Department of Corrections and Community Supervision, Office of Counsel, 1220 Washington Avenue, Bldg. #4, Albany, N.Y. 12225;

---

[1] Based upon information and belief, and an extensive conversation with a formerly incarcerated Individual, who was the Block Clerk in HBA, plaintiff was able to identify the second Strip Search officer (<u>previously idenitifed as John Doe #1</u>) as **Correctional Officer V. Marsico**.

12. Ms. J. Manuel, Senior Offender Rehabilitation Counselor [SORC] (*Program Committee Chairperson*); employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562;

13. Ms. Shibi Kachappily *(Nurse Practitioner)*, employed at Sing-Sing Correctional Facility's Medical Department, 354 Hunter Street, Ossining, New York 10562;

14. Mr. Felix Ezekwe *(Doctor)*, employed at Sing-Sing Correctional Facility's Medical Department, 354 Hunter Street, Ossining, New York 10562;

15. Mr. Frederick Parker *(Doctor)*, employed at Sing-Sing Correctional Facility's Medical Department, 354 Hunter Street, Ossining, New York 10562;

16. Ms. Razia Ferdous *(Doctor)*, employed at Sing-Sing Correctional Facility's Medical Department, 354 Hunter Street, Ossining, New York 10562;

17. Correctional Sergeant, Mark Larsen, (710 Post Area, including Infirmary and Commissary) employed at Sing-Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562; [2]

### III. LEGAL BASIS FOR CLAIM:

Violation of Plaintiff's Federal Constitutional rights:

1. First [1st] and Fourteenth Amendment [14th], Free Speech and Due Process: the right be free from retaliation in filing and voicing to petitions and grievances (¶ 4-7, 11-29, 32-33, 40, 43, 44-46, 53-56, 57-58, 60-63, 92-98);

2. Eighth [8th] Amendment: Cruel & Unusual Punishment (¶ 42-46, 47-49, 52, 66-83);

3. Deliberate Indifference (¶ 30-31, 34-39, 41, 42-46, 47-49, 52, 66-83, 84, 86, 90);

4. Negligence (¶ 35-36, 38-39, 42, 44, 47, 52, 86, 89, 90);

---

[2] This defendant, Correctional Sergeant, Mark Larsen, has been added with permission of the Court, the Honorable, Cathy Seibel.

5. <u>Failure to Act</u>: (¶ 34-39, 41, 44, 50-51, 53-56, 68-71, 84, 86, 89, 90);

6. <u>Adequate Medical Care</u> (¶ 30-31, 42, 47-52, 66-83, 84, 90)[3]

7. <u>Illegal Strip/Cavity Search</u> (¶ 60-63, 88)

8. <u>Conspiracy</u> (§§ 1985 and 1986)(¶ 15-17, 19-21, 23-24, 27-29, 53-56, 57)

## IV. PRISONER STATUS

Plaintiff, Sheldon P [Preston] Johnson, Book & Case number # 241-24-00514, currently being detained at Riker's Island Correctional Facility, 09-09 Hazen Street (G.R.V.C.), East Elmhurst New York, 11370, is proceeding pro-se.

## V. STATEMENT OF CLAIM:

<u>Place of Occurence</u>: Sing-Sing Correctional Facility (N.Y.S. D.O.C.C.S), Messhall (kitchen), Housing Block A (HBA), Medical Unit [infirmary] 1st and 2nd Floor, corridor of facility hallway leading into and entrance [stairway] of Housing Block B (HBB), 710 Post and Commissary. Beginning in December 2021 and continuing into 2023.

<u>Statement of Facts:</u>

1. Plaintiff, Sheldon P. [Preston] Johnson, Book & Case number # 241-24-00514, currently detained at Riker's Island Correctional Facility, 09-09 Hazen Street (G.R.V.C.), East Elmhurst New York, 11370, proceeding Pro-Se.

---

[3] The '*Legal Basis for Claim*' section herein, is a tentative outline [subject to the Court's view of the actual issues] of the claims that plaintiff seeks to address in this complaint.

5

2. Plaintiff, was resentenced on May 3, 2023, and released from NYS DOCCS custody, under DIN 99-A-3011, on May 4, 2023. All allegations alleged herein pertain to a previous incarceration pursuant to Departmental Identification Number (DIN) #99-A-3011.

3. Plaintiff is in possession via FOIL request, of most, if not all documentation to support his allegations stated herein; including the *exhaustion* of administrative remedies.[4] The actions and conduct of the defendants herein, at all times were committed under the color of state law and deprived Plaintiff of the rights, privileges or immunities secured by the United States Constitution.

4. While at Sing-Sing Correctional Facility (hereinafter, SSCF), the plaintiff was an elected '*Inmate Liaison Committee*' representative for the incarcerated population pursuant to New York State Department Of Corrections and Community Supervision (hereinafter, NYS DOCCS), Directive # 4002.

5. On December 6, 2020, during the height of the COVID-19 pandemic and while sheltered in place at SSCF, plaintiff, who was the ILC Secretary, along with other ILC representatives and Grievance representatives (IGRC), were accused by the SSCF administration of staging and orchestrating a protest where the men in HBA chose not to come out of their cells, use the phone or kiosk/tablet program. Allegedly, an I/I who chose not to participate in the protest, was assaulted and died. The administration attempted to frame a medical emergency as a homicide, however, it was later discovered that this I/I's death was the result of a genuine medical emergency.

6. On December 8, 2020, the ILC [including plaintiff] and the Grievance representatives were called on by the administration to communicate with the population and inquire as to what their grievances were and why they were protesting. In response this request from the *Deputy*

---

[4] Plaintiff has exhausted all 'Administrative Remedies' with regard to the complaints alleged herein and is in possession of the grievance responses from Former Superintendent, Michael Capra (Defendant #11), who upheld and signed the denial of plainitff's grievances; including CORC (Central Office Review Committee) responses to relevant grievances

6

*Superintendent of Security, Daye*, plaintiff and the other reps spoke with the incarcerated population, which resulted in a nine (9) point written memorandum from the ILC/IGRC reps to the *Deputy Superintendent of Security, Daye*.[5]The protest and nine point letter resulted in Plaintiff [ILC Secretary] and I/I Marcel Vachet [ILC Chairman] being threatened with a transfer to Shawangunk Correctional Facility and "a need to do the right thing (regarding the issues we argued on behalf of the Incarcerated population), for our '*Clemency*' applications" were currently on [his] the Superintendent's desk."

7. During the height of the 'Pandemic' between July of 2020 through January of 2023 [when things began to return to normal], plaintiff and the ILC team wrote potentially hundreds of letters. It was during this period of COVID-19 sheltering in place where much of the animus for plaintiff as an ILC representative initiated and continued to snowball. The letters that were written resulted in a number of outside investigations by OSI (Office of Special Investigation), for the disappearance of organizational funds [monies] from Facility accounts, ILC included; and Correctional Association of New York [C.A.N.Y]: for staff abuses [excessive force], Due Process concerns within the IGRC program and violations of visitation policies by Superintendent, Michael Capra. During this time period a number of *personal* visits were made to plaintiff's cell by

---

[5] The nine point memorandum included: 1. Strip Frisks/searches being conducted in violation of NYS DOCCS Directive #4910; 2. Cell searches being conducted in violation of NYS DOCCS Directive #4910; 3. Strip frisk being conducted after non-contact visits in violation of NYS DOCCS Directive #4910; 4. The Officers of K-9 unit allowing the dogs to sniff into the crotch of female visitors; 5. The mishandling and missing items of food packages in violation of NYS DOCCS Directive #4911; 6. Not enough phones in the yard to accomodate the population; 7. Phones; 8. The law library not being given adequate supplies to meet the needs of the population, as well as I/I's not being afforded adequate access; including no notary services [the notary officer died from COVID]; and, 9. The tyrannical behavior of a Sergeant Martinez.

Plaintiff filed a retaliation grievance in response to the accusations of the SSCF administration under Grievance #0727-20 (this grievance is not related to the claims in this petition). Plaintiff is also still in possession of the nine (9) point letter to DSS Daye (¶ 6) and grievance #0727-20. In total, there are **ten** exhausted grievances that are relevant to this petition before the Court; and seven grievances [1. 0727-20; 2. 0111-21; 3. 0112-21; 4. 0034-22; 5. 1205-22; 6. 0100-23; 7. 0335-23) that plaintiff filed in connection with some form of retaliation that are not directly relevant to the claims in this petition, but illustrate a clear pattern of retalitory conduct by the SSCF Administration. Plaintiff is also in possession of the seven aforementioned grievances.

7

*Assemblyman Eddie Gibbs*, who was formerly incarcerated and assisted the plaintiff, the ILC team and IGRC reps by communicating with Julia Salazaar and Senator Weprin, who were both on the Board of Corrections Commission in addressing complaints at SSCF. One officer that plaintiff had formed a repoire with, informed plaintiff to be very careful because he "had a red dot on his head [and they, *administration*, were calling him] the Al Sharpton of Sing-Sing."

8. On or about 5/26/21, plaintiff was sent out for an MRI by Nurse Practitioner, *Ms. Shibi Kachappily* (Defendant #13), for the purposes of an approved spinal surgery.

9. In the summer of 2021 (during the pandemic), plaintiff began working in the SSCF messhall (kitchen) with limited duties due to his injuries.

10. On 9/23/21, plaintiff received his first 'Inmate Progress Report' (evaluation), rating his work ethic as 'above average'.

11. On 12/31/21, plaintiff filed a formal PREA (*Prison Rape Elimination Act*)[6] complaint with the OSI, against Correctional Officer (hereinafter, C.O.) *Clinton Thomas*, (defendant # 1) also known throughout the prison population as 'T-Pain', when plainitff witnessed his sexual escapades and manipulation of Incarcerated Individual (hereinafter, I/I) Maddox, who worked in the basement of the messhall's laundry room. The same place where plaintiff was a witness to sexual activity between C.O. *Clinton Thomas* and I/I Maddox[7].

12. On or about 1/17/22, plaintiff was confronted by C.O. *Clinton Thomas*, at 5:30-6 a.m. while working in the SSCF messhall, where C.O. *Clinton Thomas* acknowledged the PREA complaint filed against him by plaintiff (Id., ¶ 11), and threatened plaintiff stating "you know you

---

[6] Unfortunately, Plaintiff has been unable to locate the December 31, 2021, PREA complaint, submitted to the Office of Special Investigation. However, it should be attainable during Discovery; plaintiff is in possession of the 2nd complaint to OSI (Id. ¶ 22) which references the 1st complaint ( Id. ¶ 11) against C.O. Clinton Thomas

[7] Shortly after the complaint was submitted, I/I Maddox, who was a practicing Muslim, was assaulted [slashed] by other Inmate Muslims in the messhall for engaging in Homosexual activity. Based upon information and belief, I/I Maddox was interviewed by OSI but refused to cooperate

8

done fucked up right?" A popular characterization from the movie 'Menace to Society' and walked off stating "what goes around comes around." Which plaintiff interpreted as his intent to *retaliate* for filing the PREA complaint against him.

13. On 1/20/22, plaintiff filed a grievance complaint against C.O. **Clinton Thomas** (**Grievance File: # 0059-22**)[8] for making threats and *retaliation*.

14. On or about 1/27/22, plaintiff was interviewed by Ms. Simmons from the PREA office of OSI, where plaintiff reiterated the context of his original complaint (Id., ¶ 11), as well as the recent threats of *retaliation* made by C.O. **Clinton Thomas** *(defendant # 1)*(Id., ¶ 12-13).

15. During this time period multiple I/I's came to warn plaintiff that 'T-Pain' (C.O. **Clinton Thomas**) was calling plaintiff a '*snitch*' for the filing of the PREA complaint and alleging payback.

16. On 2/7/22, unbeknownst to plaintiff, Messhall (Kitchen) **Sergeant Thomas Knight** *(defendant # 3)*, filed a '*removal from program*' form against plaintiff for '*documented poor performance*' and '*documented disruptive behavior*' and accused plaintiff of stealing items from the messhall and receiving a Misbehavior Report (hereinafter, MBR), for possessing unauthorized items. **Sergeant Thomas Knight's** removal of plaintiff from his employment in the Messhall was an adverse act[ion] of *retaliation,* when he conspired against plaintiff with C.O. **Clinton Thomas** for the filing of the PREA complaint (Id., ¶ 11); in addition to other complaints that plaintiff had filed as an ILC rep and brought to the attention of administrative staff regarding problems and/or violations in the distribution of spoiled, soiled and unedible messhall food.[9]

---

[8] **IT SHOULD BE DULY NOTED**, as part of the Grievance Procedure, under NYS DOCCS Directive #4040, all grievance appeals before they are appealed to CORC (Central Office Review Committee), are titled 'SUPERINTENDENT RESPONSE' with a written response from the Superintendent, as well as his signature, affirming, denying or modifying the grievance committee's decision. Wherefore, Michael Capra, (defendant #11), cannot assert that he was not familiar with or made aware of any particular situation at his facility that needed to be rectified or addressed.

17. On 2/8/22, the following day [as predicted by *Sergeant Thomas Knight*, the day before at ¶ 16], a cell search was conducted, and plaintiff was accused of possessing 'Black Pepper' (an unauthorized messhall item) and possessing an over priced pair of 'Air Jordan' sneakers. The Air Jordan sneakers are unrelated to plaintiff's removal from the messhall, nor could they be used as a reason for plaintiff's removal.

18. Ironically, on the same day of 2/8/22, plaintiff received his second 'Inmate Progress Report' (cf., Id ¶ 10) granting him a promotion, a pay raise, and reporting '*no disruptive behavior or poor performance*' as falsely stated by Messhall *Sergeant Thomas Knight* in his program removal request (Id., ¶ 16). In fact plaintiff received all but one, above average check marks for his attitude, behavior, and work ethic.[10]

19. On 2/9/22, as previously predicted by messhall *Sergeant Thomas Knight* in his fraudulent 'program removal form' on 2/7/22 (Id., ¶ 16), plaintiff was issued a MBR for possessing a quantity of Black Pepper and overpriced sneakers. How *Sergeant Thomas Knight* (Defendant #3) was able to predict the cell search of plaintiff's cell on 2/8/22, the day before the cell search on 2/7/22 (Id., ¶ 16), and foresee the issuance of the MBR for an 'unauthorized item' was a clearly staged act[ion] of retaliation against plaintiff for exercising his rights to file grievances and seek redress, against *C.O. Clinton Thomas* and messhalll conditions on behalf of the prison population.

20. On 2/9/22, it was brought to plaintiff's attention by I/I Paul Giddens (DIN #13A2755), that C.O. *Clinton Thomas* approached him inquiring about plaintiff's sexual preferences and if I/I Giddens was with plaintiff at Auburn Correctional Facility, where plaintiff allegedly received a

---

[9] Plaintiff is in possession of a number of letter that he wrote to the SSCF Administration and OSHA, concerning food violations [metallic residue on the sheet pans, no cleaning solution], as well as issues related to the Showers, Kiosk/phone use, etc.

[10] Plaintiff is in possession of all progress reports, grievances and complaints previously filed; as well as responses from many of the defendants herein.

MBR for homosexual behavior (activity). How C.O. *Clinton Thomas* was able to discover that plaintiff was in fact at Auburn C.F. with I/I Giddens, plaintiff does not know. Plaintiff can only assume that C.O. *Clinton Thomas* was conferring with security staff [*or Sergeant Thomas Knight*] to gain inflammatory information against plaintiff for retalitory and dissemination purposes.

21. On 2/9/22, plaintiff was also informed by I/I Gregory Davis (DIN #15B3670) and another I/I who wished not to be identified that C.O. *Clinton Thomas*, who plaintiff had already filed multiple complaints against, participated in the cell search of plaintiff's cell on 2/8/22 (Id., ¶ 17), which would have required for C.O. *Clinton Thomas*, to temporarily abandon his post in the messhall [which is only a single block's walking distance from J-Gallery where plaintiff's cell was located], as outlined in plaintiff's grievance (Infra, ¶ 24).

22. on 2/9/22, plaintiff sent another letter to OSI informing them of the information received from I/I's Giddens and Davis, as well the placement of contraband (Black Pepper) into plaintiff's cell and *C.O. Clinton Thomas'* unauthorized participation in the search of plaintiff's cell.

23. The MBR (Id., ¶ 19)(which was later dismissed and expunged), stating that black pepper was discovered in plaintiff's cell was written and authored by C.O. *Ceasar Gonzalez* (Defendant # 2). C.O. *Ceasar Gonzalez* falsified information in his written MBR [an adverse act[ion] of *retaliation*] on behalf of his colleague C.O. *Clinton Thomas*, who did not have authorization to be present at or participate in the search of plaintiff's cell on 2/8/22 (Id., ¶ 17).

24. On 2/9/22, plaintiff filed a grievance (**Grievance File** # **0157-22**) alleging retaliation, abandonment of post (messhall) and the placement of contraband into plaintiff's cell by C.O. *Clinton Thomas* and sanctioned [agreed to] by C.O. *Ceasar Gonzalez,* author of the MBR.

11

According to the IGRC (Inmate Grievance Resolution Committee) response, hearing and investigation, "based on form 2077 (cell frisk/contraband receipt) there was no Black pepper found or removed from grievant's cell." However, on the MBR it specifically states "(1) Messhall 16 ounce clear plastic container filled with messhall black pepper valued at $12.75."[11]

25. On 2/9/22, plaintiff who was an elected ILC representative (Id., ¶ 4), for Housing Block A (HBA), at SSCF and was required to investigate and act as a 'liaison' between the Executive Administrative staff and the incarcerated population, wrote to The Office Of Occupational Safety and Health Administration (OSHA), concerning issues of the safe consumption of food being served in the messhall where plaintiff was employed. Plaintiff is in possession of the letters he wrote as well as the responses received from OSHA (Id. Footnote #9).

26. On 2/17/22, plaintiff began a disciplinary hearing conducted by Lieutenant Bodge, for the MBR received on 2/9/22 (Id., ¶ 19). Plaintiff plead not guilty and it was immediately determined by the Hearing Officer, Lieutenant Bodge, *when plaintiff requested that the Black Pepper alleged to be discovered during a search of plaintiff's cell be produced at the hearing,* that plaintiff possessed no Black Pepper as alleged in the MBR. Although all attempts by plaintiff to have this particular issue regarding the Black Pepper documented in the 'Statement of Evidence Relied Upon' and 'Disposition Rendered' the Hearing Officer adamantly refused and the disposition rendered only mentions the possession of 'Air Jordan' sneakers as being evidence relied upon in a fact finding of guilt by the hearing Officer.[12]The Hearing Officer found plaintiff

---

[11] Plaintiff is in possession of said MBR, where it clearly states Black Pepper was found in his cell during a search.

[12] The MBR, however, specifically states that 'Black Pepper' was discovered in plaintiff's cell during a cell search. The significance of the Black Pepper is that although used in the messhall as an ingredient, it is stored in a locked cabinet, accessible only by Food Service [Civilian] Cooks and possession of which constitutes contraband for its use as a weapon to create pepper spray. Correctional staff [especially Messhall Officers] know that the possession of black pepper by any messhall worker will automatically result in termination from messhall employment.

not guilty [dismissed] of the smuggling charge and stolen property charges which were specifically attached to the fabricated possession of Black Pepper stolen from the messhall.[13]

27. On 2/17/22, before the completion of the disciplinary hearing (Id. ¶ 26), and after dismissing the charges that plaintiff possessed Black pepper stolen from the messhall, plaintiff was escorted from his job in the messhall and back to his housing location. Upon arriving at his housing location plaintiff was instructed to turn in his uniform messhall whites—that he was fired. This was a direct act of retaliation [program removal form ¶ 16], for there had been no guilty disposition regarding the MBR, and in fact the charge for possessing Black Pepper [the only charge that would have resulted in plaintiff's removal of employment from the messhall] had already been dismissed; yet, plaintiff was fired.

28. Approximately 20-30 minutes after being escorted back to his cell and informed that he was fired, plaintiff was instructed to pack up his property and move to the top tier (4th floor). In the process of this *retalitory firing*, which resulted in the *cell move*, plaintiff further injured his back moving his property up-and-down four flights of stairs. It should be noted that the galleries at SSCF are 88 cells long, a little longer than the average New York City block.

29. On 2/21/22, plaintiff received an official 'Program Notification Form' from the Program Committee removing him from his messhall program.

30. On 2/22/22, plaintiff filed a sickcall slip requesting to see his provider, *Nurse Practitioner, Shibi Kachappily* (defendant #13), complaining of back pains, seeking reissuance of his bus pass, which was disappeared during the cell move; as well as a flat pass.[14] *Nurse*

---

[13] Plaintiff was in possession of the DVD of the disciplinary hearing, however, it was lost upon moving from Westchester to Manhattan; and can be acquired through the Discovery process to establish the dismissal of the Black pepper and illustrate the hearing officer's refusal to include the dismissal of this charge in his decision.

[14] Since plaintiff's arrival at SSCF he was issued a special bus (transportation) pass, resevered for I/I with extensive injuries and unable to travel the vast landscape that is SSCF.

*Practitioner, Shibi Kachappily* (defendant #13), had been plaintiff's medical provider for '*more than two years*' since plaintiff arrival at SSCF (January 2020), and was well aware of plaintiff's serious medical conditions and approved/pending spinal surgery (Id. ¶ 8). Despite this awareness, *Nurse Practitioner, Shibi Kachappily*, ignored plaintiff's sick call request(s), knowing the geographical make up of the facility [being on a hill] and full well it would result in plaintiff having to walk up and down throughout the facility, which would exacerbate his conditions.[15]

31. All of plaintiff's sick-call slips were ignored until 3/3/22 (nine days later)(cf. Footnote 25 [infra], p. 26, herein).

32. On 2/23/22, plaintiff filed a grievance (**Grievance File #0201-22**), outlining the circumstances in which he was issued a MBR with fradulent charges in retaliation for exercising his civil, state and federal rights to seek redress for the unethical conduct and unprofessional behavior of *Sergeant Thomas Knight*, in removing plainitff from the messshall in violation of NYS DOCCS Directive #4803 'Inmate Program Placement' and Correction Law § 138 (4).

33. On 2/23/22, plaintiff's disciplinary hearing was recommenced and despite the testimony of Deputy Superintendent of Security, Courtney Nixon, testifying on plaintiff's behalf that plaintiff should not have been issued a MBR for possessing what was classified as an over priced pair of 'Air Jordan' sneakers [which plaintiff brought with him when transferred from a previous facility], plaintiff was found guilty of possessing said sneakers. As previously stated, all charges related to the fraudulent possession of Black Pepper were dismissed.

---

[15] In 1989 plaintiff was involved in a horrific car crash in Manhattan. In 1994, he suffered from two crushed disc in his spine [L4-5], a bullet wound to his leg, a protruding tail bone [from the impact of the fall], pins in his right foot and ankle, a collapsed lung [from the impact of the fall] and his right leg being ¼ of an inch shorter than his left leg [also from the impact of the fall]; all stemming from being shot and pushed from a fifth floor window in Manhattan. According to the surgeon, plaintiff permanently suffers from a form of Spinal arthritis because of his injuries, wherein each year plaintiff's condition worsens.

34. On 2/25/22, after receiving no response to his sick call slips (Id. ¶ 30), plaintiff wrote a letter to *Deputy Superintendent of Health, Latisha Jackson* (defendant # 9), informing her of plaintiff's pending/approved spinal surgery, that he was moved to the top tier and further injured his back, that he needed a resissuance of his bus pass and flat pass, pain medication, was in serious pain and needed to see his provider, *Nurse Practitioner, Shibi Kachappily* (¶ 30). *Deputy Superintendent of Health, Ms. Latisha Jackson,* had access to plaintiff's medical records and *failed to act* and [at a minimum] to look into the *seriousness* of plaintiff's request and acted in a manner that was *deliberately indifferent* to plaintiff's history of serious injury and medical needs.[16] *Deputy Superintendent of Health, Ms. Latisha Jackson,* was no stranger to plaintiff for they had spoken and interacted verbally, at a number of ILC meetings, wherein plaintiff not only discussed potential in's-and-out's [i.e. what to expect] of his impending Spinal Procedure (Id. ¶ 8), but also discussed issues affecting the facility's clinic/infirmary area.[17]

35. On 3/3/22 (nine days later), plaintiff was finally called to the medical department and issued a bus pass and flat pass to move to the bottom tier (first floor) of Housing Unit A (HBA). Plaintiff, however, still did not see his provider *Nurse Practitioner, Shibi Kachappily,* and when he inquired as to when he would see his provider he was simply told "soon.[18]" For *nine* days plaintiff mostly stayed in his cell, skipped meals and recreation in pain and fear of walking up multiple flights of stairs, daily, and throughout the facility [exacerbating his injury's] when he should have had been moved to the bottom tier and had access to the transportation bus, like everyone else who suffers from similar infirmities. This was a direct result of *Nurse Practitioner,*

---

[16] Plaintiff is in possession of a carbon copy of the letter mentioned herein.

[17] ILC meetings are attended by a number of executive staff (Superintendent, Deputy Superintendent of programs, Deputy Superintendent of Administration, Deputy Superintendent of Security, Deputy Superintendent of Health, Commissary supervisor, etc. All executive staff that have a active hand in the everyday administration of the facility.

[18] The issuance of a flat pass is a significant indication that the medical department recognized plaintiff's medical conditions [injuries]. Flat passes are not issued lightly or without due consideration to an I/I medical status.

*Shibi Kachappily,* refusal to call plaintiff to sick call and a direct result of *Deputy Superintendent of Health, Latisha Jackson,* failure to look into the seriousness of plaintiff's request.

36. Nurse Peter's, who issued plaintiff his flat pass informed plaintiff that it (flat pass) goes in effect <u>immediately</u>. Nurse Peter's informed plaintiff that he would call the "*Movement & Control*" Correctional Officer [now know to be], *Jasmin Soto* (Defendant #6; **formerly Jane Doe #2**), and inform her of the move and that plaintiff should also inform the housing area supervisor. Correctional Officer, *Jasmin Soto,* was the 'Movement & Control' officer and was directly responsible for all cell moves throughout HBA in SSCF on 3/3/22, including the medically mandated flat pass issued by *Nurse Practitioner, Shibi Kachappily* (<u>Id.</u> ¶ 35). Correctional Officer, *Jasmin Soto,* was the 'Movement & Control' and her failure to act and move plaintiff on a medically mandated flat pass constituted a *deliberate indifference',* and *failure to act* to a *serious medical condition.*

37. Upon arriving back to HBA and attempting to speak to an area supervisor, plaintiff was informed "not now, we have a medical emergency" and plaintiff was directed to lock into his cell. Despite speaking to multiple area supervisors and CO's regarding the '*Flat Pass*' move, plaintiff was either ignored and even told by Sergeant Moore that "flat passses don't really hold any weight."

38. On 3/4/22, plaintiff filed a grievance (**Grievance File #0248-22**) as a means to document "*Movement & Control's*"refusal (failure) to adhere to a medical order by *Nurse Practitioner, Shibi Kachappily* (<u>Id.</u> ¶ 35) to move plaintiff to the flats for serious medical reasons. Plaintiff' grievance (<u>Id.,</u> **Grievance No. #0248-22**), specifically outlines how the denial of his medical issues as well as a doctor's orders for plaintiff to move to the flats constitute negligence, deliberate indifference and failure to protect. It has been verified and substantiated that the C.O.

working in '*Movement & Control*' on March 4, 2022, was **Correctional Officer, Sheryl Davis** (Defendant # 7; **formerly Jane Doe #3**). Correctional Officer, **Sheryl Davis**, was the 'Movement & Control' officer and was directly responsible for all cell moves throughout HBA on 3/4/22, including the medically mandated flat pass issued by **Nurse Practitioner, Shibi Kachappily** (¶ 35). Correctional Officer, **Sheryl Davis**, was the 'Movement & Control' and her *failure to act* and move plaintiff on a medically mandated flat pass constituted a *deliberate indifference*', and *failure to act* to a *serious medical condition*.

39. Later during the day, on the afternoon of 3/4/22, plaintiff twisted the right ankle of his foot [19] and falling in the stairwell of HBA injuring his wrist, ankle, foot and knee and exacerbating his pre-existing spinal condition. Plaintiff was rushed to Mount Vernon emergency room in an ambulance with visibly noted swelling to his wrist, knee and foot. Upon return to SSCF plaintiff was admitted into the facility's infirmary in a wheel chair.

40. On 3/10/22, acting Deputy Superintendent of Security, Courtney Nixon, reversed, dismissed and expunged the MBR of 2/9/22, purusant to plaintiff's appeal to the guilty verdict in his disciplinary hearing completed on 2/23/22 (see Id. ¶ 34).

41. On 3/14/22, plaintiff received a letter [response] from **Deputy Superintendent of Health, Latisha Jackson**, *acknowledging* receipt of his complaint dated 2/25/22 (Id. ¶ 32).

42. On 3/14/22, despite plaintiff's complaint's of pain and difficulty walking, he was discharged from the medical unit by **Doctor Felix Ezekwe** (defendant #14) with a pair of defective crutches. Plaintiff was never instructed on how to properly use the crutches. Allegedly, Nurse Martin Molina, did a once over inspection of the crutches issued to plaintiff by **Doctor Felix**

---

[19] Which is documented as ¼ of an inch shorter than his left leg, due to falling out of a fifth floor window; the same injury that resulted in his spinal injury for which he was awaiting surgery.

*Ezekwe* and informed plaintiff that they were "okay." However, **Doctor Felix Ezekwe,** was responsible for ensuring that the Crutches issued were in proper order and working condition.

43. Upon exiting the clinic, escorted by C.O. Tafari Smith and I/I infirmary worker Stephen Braithwaite, plaintiff was informed that he was being moved from housing Block A to Housing Block B, and for multiple reasons said move was malicious, retalitory and deliberately indifferent to plaintiff injuries, status as an ILC representative and serious medical needs.

44. As previously stated, plaintiff was an elected ILC representative, elected by the HBA prisoner population, and could not simply be moved from HBA by '*Movement & Control*', **Correctional Officer, Jessica Reyes** (Defendant #8)(**formerly Jane Doe #4**), per Directive #4002 of the Inmate Liaison Committee, without the direct consent or authorization of the Superintendent or his designee (See, NYS DOCCS Directive #4002). **Correctional Officer, Jessica Reyes,** as the 'Movement & Control' officer of 3/14/22, would have had to knowingly authorize this illegal cell move to HBB in disregard of Directive #4002. *Medically*, the move from HBA-to-HBB, required the climbing of an awkwardly steep set of stairs, which was almost impossible with the crutches to get into and out of HBB which is on an inclined slope, contrary to the *flat order*, plaintiff's injuries and medical needs, and was Cruel & Unusual as well as deliberately indifferent to the seriousness of plaintiff's medical conditions.

45. When plainitff discovered that he was being moved to HBB (Id. ¶ 43), the escort officer, C.O. Tafari Smith expressed his dissent to plainitff being moved and took plaintiff back into the infirmary where plaintiff spoke with both Nurse Martin Molina and Nurse Adminsitrator Dyer, who both agreed *medically*, that plaintiff should not climb up any stairs with crutches. Thus, on behalf of plaintiff, Nurse Administrator Dyer, called '*Movement & Control*', **C.O. Jessica Reyes** (Defendant #8), in the presence of plaintiff and explained to 'Movement & Control' (of 3/14/22)

18

why plaintiff should not be sent to HBB (Medical condition, crutches, steep steps, flat order, and ILC) and was falsely informed and outright deceived by 'Movement & Control' [*C.O. Jessica Reyes*] that plaintiff would remain in HBA.

46. However, upon arriving at HBA, despite Nurse Administrator Dyer's conversation with 'Movement & Control' [C.O. *Jessica Reyes*] just minutes ago (Id. ¶ 45), and plaintiff who had himself spoken to her when he arrived at HBA, but was under the impression that C.O. *Jessica Reyes* was the O.I.C. [officer in charge] of HBA because she never identified herself as the 'Movement & Control' officer.[20] When plaintiff and CO Tafari Smith attempted to explain to C.O. *Jessica Reyes* [who was in fact the Movement & Control officer], of the conversation that Nurse Administrator Dyer just had with 'Movement & Control' in the clinic, both plaintiff and C.O. Tafari Smith were told to take it up with the HBB [Housing Block B], O.I.C. [Officer-in-Charge]. "It is a movement & control issue" she stated; never acknowledging her conversation with Nurse Administrator Dyer, when in fact, she was the Movement & Control officer, that Nurse Administrator Dyer had just spoken to and was informed that plaintiff "would remain in HBA." (¶ 45).[21]

47. While proceeding down the corridor to HBB, which is equivalent to 1½-2 New York City blocks, plaintiff was stopped by C.O. Tafari Smith [escort officer] who noticed that the rubber cap (stopper) on the bottom of the crutch [to provide traction] had ripped and fell off, and the screw

[20] **See, Paragraph 45 of the original complaint where plaintiff mentions CO Reyes by name as being the Officer In Charge, and informed plaintiff that it was a movement & control issue, when she was in fact the 'movement & control officer herself. The movement & control office is stationed inside HBA, directly next door to the Officer-in-Charge's [OIC] office in HBA.**

[21] Plaintiff asserts that many of the complaint's he filed on behalf of the Incarcerated population in HBA, where C.O. Jessica Reyes, was a steady officer, were filed against and/or in opposition to the Correction Officers in that unit (HBA) and plaintiff believes that C.O. Jessica Reyes, intentionally deceived plaintiff as well as her co-worker, C.O. Tafari Smith, because she was complicit in the illegal cell move as a means to have plaintiff removed as an ILC representative for the Incarcerated population in HBA. Each housing Unit has their own elected ILC representative and once moved into HBB plaintiff would no longer be able to function as an ILC representative.

on the same crutch (right) began unravelling. C.O. Tafari Smith attempted to repair the crutch to no avail. The same crutches that had been issued to plaintiff and supposedly inspected by **Doctor Felix Ezekwe** (Defendant #14), as being in good condition, yet, in a matter of mere minutes after leaving the infirmary had begun falling apart (Id. ¶ 42).

48. Upon arriving to the bottom entrance of the steps leading into HBB, plaintiff attempted to climb the steep steps with the crutches, however, the exposed wooden stump of the right crutch (where the rubber cap had originally been), slid on the metal of the steps and plaintiff fell onto his right side.

49. A medical emergency was declared and plaintiff was escorted back to the infirmary in a wheelchair, for treatment and re-admitted to the infirmary in pain and discomfort.

50. On 3/15/22, while housed in the infirmary (HS-W2-103). Plaintiff spoke with **Deputy Superintendent of Administration, Albert Helm** (Defendant #10), regarding the incident that occurred on 3/14/22, with 'Movement & Control', the faulty crutches and being moved to HBB, despite being an elected representative of the ILC for HBA (see, ¶'s 42-49). **Deputy Superintendent of Administration, Albert Helm** (Defendant #10), acknowledged that plaintiff should not have been moved per ILC Directive #4002 and stated he would look into the matter.

51. On 3/15/22, plaintiff also sent a follow-up letter, as agreed upon per their conversation, to **Deputy Superintendent of Administration, Albert Helm**, reminding him of the conversation plaintiff had with him in the clinic and his promise to follow-up and look into the matters mentioned. Plaintiff received no response.

52. On 3/18/22, plaintiff filed a grievance (**Grievance File #0375-22**), articulating in-depth the circumstances leading to the move to HBB, the faulty crutches and his fall on the steep steps of HBB (See, ¶'s 42-49).

20

53. On 3/23/22, plaintiff received a memo from *Ms. J. Manuel, Senior Offender Rehabilitation Counselor [SORC], Program Committee Chairperson* (Defendant #12) regarding plaintiff's retalitory removal complaint from the facility messhall by *Sergeant Thomas Knight* (Id. ¶ 16-19, 24, 28). In this memo, *Ms. J. Manuel* (Defendant #12), states "you were removed from the messhall on 2/20/22, as requested by area staff for poor performance/disruptive behavior due to a misbehavior report that occurred on 2/8/22 for unauthorized items for which you were found guilty and counseled."[22]

54. *Ms. J. Manuel*, as the program committee chairperson, was designated by *Superintendent, Michael Capra* (Defendant #11), and authorized to place and/or remove I/I's from programs, per *Directive #4803* 'Inmate Program Placement' as well as the authority to place plaintiff back into his messhall job upon being informed that said charge for the 'unauthorized item' [black pepper] and the MBR was reversed, dismissed, and expunged by Acting Deputy Superintendent of Security, Mr. C. Nixon on 3/10/22 (Id. ¶ 40). However, in her letter to plaintiff, she shifted the burden on plaintiff and stated "If you would like to be reviewed to go back into the mess hall, please write to the FSA for approval." However, the FSA (Food Service Administrator) could not directly hire plaintiff and plaintiff did not need approval to work in the mess hall, plaintiff had already been employed in the messhall.

55. On 3/25/22, plaintiff wrote a detailed letter to *Ms. J. Manuel*, explaining why his removal from the messhall was retalitory, unauthorized, and in violation of both Directive #4803 'Inmate Program Placement' and SSCF 'Facility Operations Manual' # 359 which states in part

---

[22] As the Senior Offender Rehabilitation Counselor (SORC), J. Manuel, would have had access and the ability to read the 'Disciplinary Disposition rendered' on her computer which would have clearly shown that plaintiff was ultimately found guilty of possessing Sneakers. More obvious is the date in which the letter was sent 3/23/22, the MBR had already been reversed, dismissed and expunged from Plaintiff's disciplinary records by Deputy Superintendent of Security, Courtney Nixon, on 3/10/22 (See, ¶ 40)

"Area supervisors [e.g., *Sgt. Thomas Knight*] may not hire or fire inmates, although the program committee will accept recommendations from supervisors. Such recommendations shall be forwarded by the supervisor in writing and with supporting documention to the program committee."[23]

56. On 4/6/22, plaintiff again wrote to *Ms. J. Manuel* (¶ 53-55) specifically informing her that his MBR has been reversed, dismissed and expunged and thus required plaintiff to be placed back into the messhall to his original status prior to the falsified MBR. As chairperson of the program committee, and being directly responsible for the hiring and firing of I/I's, *Ms. J. Manuel,* had a responsibility [based upon clearly established NYS DOCCS Directives designed to thwart retaliation & discriminatory practices] to place plaintiff back into his job description, yet despite a mountain of evidence and the dismissial of the misbehavior report, she refused to do so and is complicit in the retalitory actions of *Sergeant Thomas Knight* (Defendant #3). Plaintiff cannot say for certain that there was no agreement [or discussion] between *Ms. J. Manuel* and *Sergeant Thomas Knight* (defendant # 3), for it does appear circumstantially, that *Ms. J. Manuel* formulated an 'intent' to defy the clear language of the Directive and facility Operations Manual, when she adamantly refused to place plaintiff back into his program after the charges of the MBR were dismissed and expunged (Id. ¶ 40).

57. On 4/8/22, plaintiff received documentation from the FOIL office providing him with the 'Program Removal Form' of 2/7/22 (Id. ¶ 13), submitted by *Sergeant Thomas Knight* (defendant #3), as well as the search log book for the cell search of 2/8/22 (¶ 14), which did not show that any 'black pepper' was discovered or recovered and supporting the grievance hearing and investigation (¶ 24) that no black pepper was stated as being recovered. Providing further

---

[23] Sergeant Thomas Knight provided no documentation of '*documented disruptive behavior*' or '*Documented poor performance*' as required per Directive #4803 and FOM [Facility Operation Manual] #359 (cf. ¶ 16).

evidence that the black pepper alleged to have been discovered in plaintiff's cell during a cell search was planted, *intently omitted from the search log book* and falsified in the MBR by ***C.O. Cearsar Gonzalez*** (Defendant #2) on behalf of his co-worker ***C.O. Clinton Thomas*** in order to justify plaintiff's removal from the messhall.[24]

58. On 4/15/22, Plaintiff and his fellow ILC representatives (Joseph Wilson DIN# 07A1282; Michael Jones DIN# 90A5292; Sean Salley DIN 02A4808; and, Dequan Hall DIN#14A5057), filed grievances against ***Superintendent, Micheal Capra*** (Defendant #11), for retaliation in response to the filing of complaints on behalf of the Incarcerated Population. During this particular dispute with the Executive Team, including Superintendent, Michael Capra (defendant #11), plaintiff was excluded from two [possibly three] ILC meetings based upon the contents of an agenda submitted by the ILC team, mentioning the names of Correctional Officers involved in a number of excessive force violations against Incarcerated Individuals. Plaintiff and his ILC representatives were told by Acting Deputy Sperintendent of Programs, Velez, that "if they [ILC] submitted another agenda such as the one they just submitted, Supt. Capra would have their souls snatched from their bodies and the entire ILC team would be transferred." (**Grievance File #0498-22).** A few months later, ILC representative *Sean Salley,* and *Anthony Arriaga* [ILC Chairman] who had already resigned for fear of losing his honor block status and conjugal visits [Family Reunion Program], were both mysteriously transferred.

59. On 5/5/22, plaintiff wrote a letter to ***Superintendent Michael Capra*** (defendant #11) attempting to rectify why plaintiff had been excluded from two ILC executive meetings, was being harrassed, and threatened by the Superintendent, resulting in an ILC resignation. It is during this

---

[24] Plaintiff asserts that there had to have been a discussion and agreement [conspiracy] between C.O. Clinton Thomas and C.O. Ceasar Gonzalez in order for the contraband [black pepper] to be placed into plaintiff's cell and for C.O. Ceasar Gonzalez to falsely insert its discovery into the MBR

time that CANY [*Correctional Association of New York*] launched an investigation and Assemblyman Eddie Gibbs was actively assisting plaintiff and ILC co-represenative Michael Jones (Id. ¶ 58), in filing complaints against Superintendent Capra and his decisions in weaponizing COVID-19 social distancing policies in the visiting room, after restrictions had been lifted, and the use of excessive force by a specific group of named Correction officers.

60. On 5/17/22 [twelve days after the incidents in ¶ 58-59), at or around 6:30 am, two masked Correctional Officers, one identified via the Cell Frisk/Contraband Receipt as *C.O. Thomas Molloy* (Badge #60693)(Strip Search Officer #1)(Defendant #4), the other *C.O. V. Marsico* (Defendant #5)(**formerly known as John Doe #1**), literally ran into plaintiff's cell while he was sleeping, ordered him to get up and in the most humiliating, degrading, traumatic and abusive fashion defiled plaintiff in an illegal strip frisk and unauthorized cavity search, in violation of NYS DOCCS Directive # 4910 "Control & Search of Contraband" (III)(F)(3), absent protocol or supervising officer.[25]

61. On this same day of 5/17/22, multiple I/I's were subjected to illegal and unauthorized Strip/Cavity Frisk, including plaintiff.[26]

62. On 5/17/22, submitted a FOIL request to obtain 'Form 1140' which authorizes probable cause for a strip frisk to be filled out by a supervising Sergeant or higher.

---

[25] According to the 'Search Log Book' a copy of which was obtained by plaintiff [**and in his possession**], the cell/strip frisk of Plaintiff on 5/17/22, was authorized for suspicion directly by *Superintendent Michael Capra* (Defendant #11);(See also, ¶ 5-7, footnote 5, regarding the nine point letter to DSS, Daye, and the facility Protest by I/I for the performance of illegal strip frisk and searches).

[26] These searches and strip frisk can and will be verified in the discovery process via the M-Gallery Log book which will document that, not only were multiple incarcerated individuals searched that day, but there was a use of force and/or assault on staff during this morning search. The SSCF security staff are notorious for performing illegal strip frisk in order to discover contraband, only to later document any discoveries of contraband as being found in the course of a normal search. Tailored and pretextual like a traffic stop to search pedestrians and avoid constitutional guidelines governing the 4th Amendment.

24

63. On 5/19/22, plaintiff filed a grievance (**Grievance No. #0630-22**), in response to the strip search and assisted more than a dozen other I/I's in filing grievances to the illegal and unauthorized strip frisks that occurred on 5/17/22 (Id. ¶ 61). In this grievance, plaintiff outlined how he was humiliated and that the grievance procedure at SSCF is a mockery of the IGRC program and violates Due Process.[27]

64. On 5/23/22, plaintiff, as an elected ILC representative wrote the Deputy Superintendent of Security, Mr. Thorpe, to rectify and address the facility's search team illegal use of strip frisk in violation of Directive #4910 (Id. ¶ 60-61).

65. On 6/24/22, plaintiff was sent to Westchester County Hospital to receive the previously mentioned spinal surgery (laminectomy), performed by Doctor John C. Galeno; an eight hour surgical procedure (Id. ¶ 8).

66. On 6/28/22, while unable to walk or use the bathroom [due to the opiates in the pain medication], plaintiff was prematurely discharged as documented by FNP Nicole M. DiMarino, of Westchester County Medical Center, strapped into a wheelchair and transported back to SSCF.

67. After being discharged from Westchester County Medical Center, plaintiff was held at the SSCF infirmary unit and received minimal treatment [inconsistent with the post-operative directions of surgeon Galeno] despite the seriousness of the surgical procedure and recovery conditions. Plaintff continuously complained about his treatment (or lack thereof) and the ventilation conditions on the infirmary where he was being held.

---

[27] Specifically, in the grievance plaintiff outlined how all grievance responses to staff misconduct (characterized as Code 49's), are boilerplate responses and fail to properly adhere to the investigatory standards of NYS DOCCS Directive #4040, and that it is **statistically impossible and improbable** "for hundreds of grievances against security staff (code 49's) to all result in unsubstantiated allegations." As an ILC representative and later an IGRC elected representative, plaintiff had access to the stats and grievance statistics, all code 49's (staff misconduct) from 2019-2022 were ALL denied. Every single one, totalling hundreds of staff misconduct grievances (code 49's).

68. Plaintiff quickly realized that the room and the infirmary in its entirety was extraordinarily hot. Upon observation and inspection of the ventilators, as well as conversations with Correctional staff and other I/I's housed in the infirmary with plaintiff, he was informed that the central A/C (air conditioning) and ventilation system had been inoperable before plaintiff's arrival to the unit. Both the ***Deputy Superintendent of Administration, Albert Helm*** (Defendant #10), and ***Deputy Superintendent of Health, Latisha Jackson*** (Defendant # 9), were responsible for the upkeep and maintenance of the infirmary unit. Moreover, neither Defendant (#9 or 10) took any pre-emptive steps or measures to ensure the safety and well being of the infirmary patients [including Plaintiff] in light of the conditions: <u>like simply allowing maintenance to unscrew the windows [the windows were screwed shut] so the inhabitants could get air and allowing the room doors to be opened to ensure circulation; and place fans into the unit to ensure proper air circulation and ventilation</u>.

69. For two weeks, between June 29-through-July 12, 2022 (13 days),[28] plaintiff suffered through 85-90+ degree weather with no open windows or adequate ventilation. On multiple occassions plaintiff was unable to sleep due to the humidity and the bandages that would not stick and repeatedly came off from the sweat on the eight (8) inch surgical laceration containing staples, which burned from the sweat running down plaintiff's back into the unhealed wound.

70. During this time (between June 29-through-July 12, 2022 [13 days]), plaintiff spoke in person with both ***Deputy Superintendent of Health, Latisha Jackson*** (Defendant #9) and ***Deputy Superintendent of Administration, Albert Helm*** (Defendant # 10), who made rounds [walked] through the unit, as well as maintenance staff, and ***Correctional Sergeant Mark Larsen*** (<u>Id.</u> ¶ 92,

---

[28] Based upon information from the National Weather service (Climate Data Online) at hhtps://www.timeanddate.com/weather/usa/new-york/historic; the weather for the days of July 12, 2022 and July 13, 2022, both were 90°. And between the dates of June 25-July 14, 2022, the average weather was 86 degrees.

Infra) who was the hospital sergeant, all who repeatedly informed plaintiff that the issue was being addressed and that they (administration) were waiting approval from Central Office to pay for the necessary repairs. On multiple occasions Plaintiff asked both *Deputy Superintendent of Health, Latisha Jackson* (Defendant #9) and *Deputy Superintendent of Administration, Albert Helm* (Defendant # 10), and *Correctional Sergeant Mark Larsen* (Defendant #17) if they could have the windows unscrewed and was repeatedly told "I'll [we'll see] look into it" yet nothing happened.

71. Due to the sensitive nature of the hospital unit, where strip search and suicide observation rooms resided, Correctional staff would not allow the room doors to remain open and the windows in the room where plaintiff slept were screwed shut and could not be opened, absent the authorization of *Deputy Superintendent of Health Latisha Jackson* (Defendant #9) and *Deputy Superintendent of Administration, Albert Helm* (Defendant # 10). It was equivalent to being trapped in a parked car in 90+ degree weather constituting *Cruel & Unusual Punishment, deliberate indifference, failure to act, failure to provide a safe environment* and resulting in actual injury to plaintiff's health and his proper recovery.

72. On 7/12/22, thirteen days after plaintiff's arrival in the infirmary unit, at or around 2:30-3:00 pm, plaintiff suffered a heat stroke and collapsed in the isolated room unconscious. Thankfully, plaintiff shared a room with a disabled I/I named William Smith [29]who notified medical staff and assisted plaintiff in regaining his consciousness and equilibrium after he fell out. The nursing staff were very upset and the Nurse attempted to title the cause of plaintiff's injury as an "alleged slipped and fall" upon which plaintiff, in his own hand writing wrote on the document "*I did not allegedly slip and fall, there is no ventilation in this room and it is over 100° degrees. I cannot breathe.*"[30]

---

[29] Based upon information and belief, the room that Plaintiff shared during this incident was named William Smith.
[30] Plaintiff is in possession of this "Inmate Injury Report"

73. On 7/13/22, the very next day after plaintiff's heat stroke (¶ 72), despite still having staples in his back, receiving no post-operative follow-up and barely able to walk, in an action that epitomized a deliberate indifference to plaintiff's recovery after surgery and the seriousness of his injuries, plaintiff was discharged from the infirmary by **Doctor Frederick Parker** (Defendant #15), under the direction and authority of **Doctor Razia Ferdous**[31] (Defendant #16), and **Nurse Practitioner, Shibi Kachappilly** (Defendant #13), all of whom were present the morning of plaintiff's discharge and who plaintiff pleaded to directly, yet they [defendant's #13 and #16] refused to even stop to speak with plaintiff or intervene in plaintiff's discharge from the infirmary[32] (**Grievance File # 0903-22**). The actions of **Nurse Practitioner, Shibi Kachappilly** (Defendant #13), **Doctor Frederick Parker** (Defendant #15), and **Doctor Razia Ferdous** (Defendant #16) constituted *Cruel & Unusual punishment, deliberate indifference, failure to act and negligence.*

74. Despite his protest, plaintiff was discharged with a cane, tylenol and no bandage changes for his stapled back. On the first day of his discharge plaintiff was forced to take a shower to avoid his stapled back from becoming infected, in a shower that was not designed to assist a person in plaintiff's condition (having no guard rails, or mats to prevent falling)(See, Footnote #33, infra, [agenda issues], p. 29, herein).

75. While in the shower on 7/13/22, plaintiff slipped but did not fall, however, his left leg shot out in an almost split type position, resulting in a sharp pain shooting down his left leg into

---

[31] Based upon information and belief, **Doctor Razia Ferdous (defendant # 16) is the head (administrative) doctor by whom all decisions are approved**. For example, in previous times when plaintiff had to have his bus pass renewed or medication refilled, Nurse Practitioner, *Shibi Kachappilly* (defendant #13), always stated that she had to get approval from *Doctor Razia Ferdous* (defendant # 16).

[32] The way that the infirmary at SSCF is designed is that patients are locked into an isolated fish tank like room [designed for individuals with communicable diseases] with 2-4 beds. As previously stated for security reasons (¶ 71), patients are kept locked into these rooms unless they are out to use the phone, shower, or kiosk for the tablets. That morning, plaintiff attempted to stop both *Doctor Razia Ferdous* and Nurse Practitioner, *Shibi Kachappilly*, by banging on the window of the glass room and both Doctor *Razia Ferdous* and Nurse Practitioner, *Shibi Kachappilly*, refused to stop or acknowledge plaintiff's bangin and presence.

his foot. With the assistance of the M-gallery porter (Korey Liggins) and the cane issued by the medical department, plaintiff was able to limp back to his cell location.

76. Despite taking the maximum amount of tylenol allowable, plaintiff experienced excruciatingly consistent sharp pains and numbing [throbbing] sensations throughout his entire left leg and left buttocks. Through the evening of July 13, 2022, and into the morning hours of July 14, 2022, plaintiff was awakened in debilitating pain. On the morning of July 14, 2022, plaintiff observed blood and yellowish discharge and fecal matter on his bedsheets.

77. On 7/14/22, plaintiff was compelled to limp to the commissary because he had little to no toiletries, amenties or bottled water (at SSCF there was a high level of Bacteria and H. Pylori in the sink [faucet] water and I/I's were regularly being sent to the clinic for symptoms associated with both). Upon arriving at commissary plaintiff inquired and was informed that there was no pulley cart device to assist I/I with infirmities. As an ILC representative, plaintiff recalled a number of agenda meetings where this issue was brought to the attention of *Superintendent Michael Capra* (Defendant #11) and his executive team members, including *Deputy Superintendent of Health Latisha Jackson* (Defendant #9) and *Deputy Superintendent of Administration, Albert Helm* (Defendant # 10), amongst others in an effort to provide reasonable accommodations for I/I with physically debilitating conditions.[33]

---

[33] Plaintiff is in possession of these ILC Agenda Meeting minutes, with the defendants names marked as present, and the specific issue of railings/guards being installed into the showers on M-Gallery was brought to their attention, years before plaintiff's arrival at SSCF. In the Executive Agenda ILC meeting of June 2017, Issue #2 Medical Care/Sick Call/Infirmary Issues: "There are numerous men that have to constantly file grievances and complaints regarding their medical care ... The men feel like they are being retaliated against due to the filing of their grievances against medical staff in violation of Directive #4040". In the Executive Agenda ILC meeting of June 2018, Issue #6: Facility Shower Project "The ILC has received numerous complaints regarding the decrepit state of the showers in HBA and HBB ..." [the DSA responded] "will look into the possibility of installing handrails in shower on the flats." In the Executive Agenda ILC meeting of April 2018, Issue #6: Commissary Runner for Elderly/Disabled Prisoners, where the ILC "recommended that a commissary clerk, whose task it would be to assist the elderly and invalid, be added to the commissary program" to assist the elderly and disabled with carrying their items to the block. The Administrations response was "the answer remains the same—we will not designate such a job." And in the Executive Agenda ILC meeting of January2020, Issue #3: Medical Showers, the ILC stated "elderly men are questing for shower handles to be installed in the gallery showers for safety while entering, exiting and during shoowers. Install shower handles

78. Nevertheless, plaintiff was forced to carry back his commissary bag, albeit a small one and did get help from other prisoners with carrying back the water. However, plaintiff asserts he should have still been in the infirmary where his commissary would have been delivered to him, like other similarly situated I/I's with injuries and disabilities.

79. As they day progressed, plaintiff continued to loose sensation throughout his left leg, experience sharp pains shooting down his left leg and buttocks, and was unable to hold his bowels. Plaintiff's left leg periodically buckled and gave out when he would get up in the cell.

80. On 7/14/22, C.O. Mercedes Romano [a steady officer on M-Gallery], decided to call a medical emergency [unprompted by plaintiff] after witnessing plaintiff's condition and his inability to move or function in the cell.

81. Upon arrival to the the facility's clinic, Nurse Pennisi and Doctor Valerie J. Monroe, made a decision to send plaintiff to Westchester Medical Center, after performing a series of 'Sensation Test' (which entails using a sharp needle like object to determine sensivity or lack thereof) and determined that plaintiff had lost most, if not all, of the sensation to his left leg and buttocks.

82. After a number of procedures at Westchester Medical Center, it was determined that plaintiff had in fact lost sensation to his leg and buttocks, but also, that he was now experiencing symptoms of Sciatiac nerve damage, a condition that plaintiff did not have prior to his surgery of 6/24/22 (Id. ¶ 65), nor was it the reason for his surgery.

83. While at the Westchester Medical Center the Doctor caring for plaintiff's needs also removed the staples that were in plaintiff's back, which was extraordinarily painful for the skin

and/or inquire acquire a medical shower chair." The Administrations response was "Inmates with severe medical impairments can not be in this facility and will be transferred to a facility accomodating those needs." The Superintendent Micheal Capra (defendant #11) is marked as present for all four executive ILC Agenda meetings, except for the one in June of 2018.

had begun to grow over the staples due to the staples being left in almost two weeks longer than Dr. Galeno's post-operative directions, that they be removed ten (10) days after the surgery; which should have been on or around July 4, 2022.

84. Plaintiff returned to SSCF on 7/15/22, at or around 5:00 am and was readmitted into the infirmary unit. On that same morning of 7/15/22, plaintiff was taken to Fishkill Correctional Facility for his first post-operative consultation follow-up, upon which Mr. Galeno became outraged that plaintiff had been discharged from the hospital and infirmary prematurely; asserting that the potential for nerve damage during the first few weeks after such an '*invasive surgical procedure*' is highly probable if the patient does too much unnecessary moving, lifting or walking without mechanical assistance (i.e. wheelchair or walker).

85. Dr. Galeno, specified in his report that plaintiff should remain in the infirmary for at least another six (6) week with a walker for his nerves to heal and upon discharge from the infirmary, he should be provided with a non-standard (or double) mattress. A grievance was filed in theses matters (**Grievance File No.: #0903-33 and #0904-22**). It should be noted that after the surgeon's recommendation that "plaintiff should remain in the infirmary for at least another six (6) week with a walker" the facility physicians[34] made no attempts to again discharge plaintiff.

86. On 7/22/22, plaintiff wrote [then] *Superintendent, Michael Capra* (Defendant # 11), regarding the pulley and or cart device for disabled I/I's coming to and from commissary; the absence of railings and/or safety bars and mats in the showers on M-Gallery (where more than half of the I/I's on M-Gallery reside there because they have flat permits and disabilities that preclude

---

[34] Facility include all SSCF Medical staff named herein as defendants: Nurse Practitioner, Shibi Kachappilly (Defendant #13); Felix Ezekwe, (Defendant # 14); Doctor Frederick Parker (Defendant #15), and Doctor Razia Ferdous (Defendant #16).

them from walking up stairs or great distances)(see, ¶ 77),[35] and the double (non-standard) mattress advised by his surgeon and Doctor John Galeno.

87. On 7/27/22, plaintiff wrote to Ms. Quandera Quick, Inmate Grievance Supervisor, regarding the failure to timely send out plaintiff's grievance appeals [**for grievances: 0248/22; 0375/22; 0404/22; 0630/22; and 0680/22**) and to potentially assist plaintiff by speaking to *DSH Latisha Jackson* (defendant #9) with obtaining a transfer to Green Haven Correctional Facility, a facility that would accommodate plaintiff's medical needs [shower railings/mats), and a commissary that provides a cart for I/I's with medical conditions.

88. On 7/29/22, plaintiff received a response from the FOIL officer in a previous request to obtain 'Form 1140' which authorizes probable cause to conduct a strip frisk (Id. ¶ 62), said FOIL request stated that "security could not locate a strip frisk report [authorization] you requested." Indicating that the strip/cavity frisk of plaintiff on 5/17/22 (Id. ¶ 60) was unauthorized.

89. On 8/8/22, plaintiff wrote *Deputy Superintendent of Health, Latisha Jackson* (Defendant # 9), citing the grievance he filed under **Grievance File No.: # 0903-22**, and the status of his double (non-standard) mattress, as advised by the surgeon and doctor (Id. ¶ 85).

90. On 8/16/22, *Deputy Superintendent of Health, Latisha Jackson* (Defendant # 9), responded to plaintiff's letter regarding the issuance of a double (non-standard) mattress (Id. ¶ 89), stating "we are in receipt of your letter dated 8/8/22. The surgeon can only make recommendations." However, according to *Doctor Valerie Monroe*, MD at SSCF, the reason that the administration frowns upon providing I/I's with double (non-standard) mattresses is purely for security reasons. Plaintiff was subsequently denied the non-standard mattress, yet based upon

---

[35] Plaintiff has prior ILC agenda meeting minutes where the issue stated was brought to the attention of Superintendent Michael Capra. This particular gallery (M-Gallery) is specifically designated for I/I's with disabilities and should have already had measures in place to ensure that such disabled I/I's would be afforded safety measures (See, Footnote # 25).

information and belief, other I/I's were afforded non-standard (double) mattresses; specifically, plaintiff's ILC co-representative, Michael Jones (Id. ¶ 58-59).

91. On 9/23/22, plaintiff again wrote to the Inmate Grievance Program Supervisor, Ms. Quandera Quick, regarding the failure to timely appeal his grievances (¶ 87).[36] In this letter to Inmate Grievance Program Supervisor, Ms. Quandera Quick, plaintiff once again seeks to have **grievances 0248/22, 0903/22 and 0904/22** appealed in accordance to the mandates of Directive #4040 governing the Inmate Grievance Program. Plainitff has filed grievances in the past against the Inmate Grievance Program Supervisor, Ms. Quandera Quick, regarding the failure to adhere to the guidelines of Directive #4040 and her failure to post plaintiff's name on the ILC electoral ballot.

92. On 10/4/22, plaintiff (as previously stated) as an elected ILC representative for the Incarcerated population for HBA at Sing-Sing Correctional facility, headed to the commissary area to address an issue where dozens of I/I's did not receive Commissary sheets the night before to be turned in the following morning, due to a new procedure being implimented by the Executive Administrative staff, regarding the commissary shopping policy.

93. While inside the commissary, plaintiff was accosted by *Correctional Sergeant, Mark Larsen* (Defendant # 17), despite having a movement pass issued by the Deputy Superintendent

---

[36] In March of 2023, under Grievance File # 0335-23, plaintiff [who at this point was elected as a 'Grievance Representative, and no longer functioning as an ILC representative], filed a grievance against his Inmate Grievance Supervisor, Quandera Quick, for a number of violations, including informing security/correctional staff of pending grievances filed against them by I/I, denying plaintiff the necessary directives in order to make informed decisions at Grievance hearings pursuant to NYS DOCCS Directive #4040 and engaging in a pattern of intimidation and abuse of authority. Shortly thereafter pending an investigation, Ms. Quandera Quick, who had been the Grievance supervisor at SSCF for more than ten years was placed on leave and subsequently transferred to another facility as a grievance Supervisor. **Plaintiff is in posssession of letters requesting that his grievances be appealed in a timely fashion and in accordance to NYS DOCCS Directive #4040.**

33

of Security, which authorized plaintiff to move through-out the facility—unescorted to deal with and address any and all issues affecting the Incarcerated population.[37]

94. ***Correctional Sergeant, Mark Larsen*** (Defendant # 17), became belligerent with plaintiff requesting to know how plaintiff had accessed the commissary area. When plaintiff showed ***Correctional Sergeant, Mark Larsen***, his ILC movement pass, he stated "fucking ILC are Bozo's. Take it back to the block, you don't belong here." When plaintiff attempted to reason with ***Correctional Sergeant, Mark Larsen***, he stepped into plaintiff's face and said "I'll take that fucking pass. You're out of place." Ironically, when ***Correctional Sergeant, Mark Larsen***, confronted plaintiff, plaintiff was in a conversation with ***Deputy Superintendent of Administration, Albert Helms*** (Defendant #10), who knew that plaintiff was legitimately at the Commissary on ILC business, but took no steps to correct ***Correctional Sergeant, Mark Larsen's*** attitude, erroneous assertion that plaintiff was 'out of place' and unprofessionalism. It should be duly noted that ***Deputy Superintendent of Administration, Albert Helms*** (Defendant #10), did not endorse the MBR [per Directive 4932] later written by ***Correctional Sergeant, Mark Larsen*** (infra, ¶ 97).

95. Plaintiff did not argue with ***Correctional Sergeant, Mark Larsen***, and proceeded back to HBA, to address the commissary issue for the incarcerated population through another channel. Once plaintiff was allowed through the 710 post (a gate manned by a Correctional officer that must be manually opened with a key), by C.O. Mayo, and was waiting on the redline in the hallway to be granted entry back into HBA, plaintiff heard ***Correctional Sergeant, Mark Larsen***, admonish C.O. Mayo for allowing plainitff through the 710 gate. Against plaintiff's better judgement, plaintiff proceeded back to the gate and stated to ***Correctional Sergeant, Mark Larsen***, "was all

---

[37] This defendant, Correctional Sergeant, Mark Larsen, has been added with permission of the Court, the Honorable, Cathy Seibel.

that necessary?" Upon which Sgt. Larsen stated "I know who you are. You're running out of time. Your pen isn't mightier than my sword."[38] At that point the C.O. opened up the HBA entrance gate and plaintiff walked away into the block (HBA).

96. Plaintiff immediately filed a grievance against **Correctional Sergeant, Mark Larsen** (**Grievance File No.: 1207-22**), asserting that Correctional Sgt Larsen be reminded of his professional responsibilities as a DOCCS supervisor; that the ILC [plaintiff] has been designated permission to move through out the facility by Security Captain Nixon, **Correctional Sergeant, Mark Larsen's** supervisor, and that he [Larsen] refrain from making threats and hindering "grievant" from performing his duties pursuant to Correction Law § 138 (4) and his First Amendment rights of the U.S. Constitution.[39]

97. On 10/7/22 (three days later), plaintiff was called to the Sergeant's office in HBA and issued a Tier I (one) MBR, charging plaintiff with 109.10 Out of Place, and 107.20 False Information, for performing his ILC responsibilities on 10/4/22 (Id. ¶ 92-96), resulting in sanctions of lost of commissary and packages. This MBR was retaliatory in that plaintiff possessed a movement pass which authorized him to be at the commissary [negating the charges] and in violation of plaintiff's rights to address grievances and complaints on behalf of the population.

98. On 10/7/22, plaintiff filed an appeal to Deputy Superintendent of Security, B. Thorpe (Id. ¶ 64), for the decision of Correctional Sergeant Joseph, finding him guilty and imposing

---

[38] This statement by Correctional Sergeant, Mark Larsen, indicates that he targeted plaintiff ["I know who you are"], that there were potentially conversations being had and/or plans being made to have plaintiff silenced ["You're running out of time] and plaintiff was known for writing complaints ["Your pen isn't mightier than my sword"], his sword being his ability to retaliate with impunity.

[39] *Correctional Sergeant, Mark Larsen,* is the hospital/commissary/710 Post area Sergeant and was responsible for addressing some [if not all] of the issues that occurred with plaintiff while he was a patient in the facility infirmary, including when plaintiff suffered a heat stroke and specifically asked *Correctional Sergeant, Mark Larsen,* to have maintenance unscrew the windows of the isolation rooms where plaintiff was locked in; as well as the grievance [which plaintiff amended after the MBR report of 10/7/22] of 10/4/22 (¶ 96).

sanctions. In plaintiff's appeal to Mr. B. Thorpe, Deputy Superintendent of Security, plaintiff stated that "the MBR was retaliatory, cited Section 250.2(e) of Directive #4932 (Chapter V, Governing Disciplinary Proceedings) that "disciplinary action must never be arbitrary or capricious, or administered for the purpose of retaliation or revenge."Plaintiff did not receive any response to his appeal.[40]

99. On 10/10/22, plainitff made a final attempt to ascertain the names of the Correctional Officer(s) who worked in Movement and Control, on the dates of 3/3/22 (¶ 36), 3/4/22 (¶ 38) and 3/14/22 (¶ 44), to no avail.

100. In December of 2022, plaintiff resigned and withdrew his name from the upcoming ILC ballot.

100. These unidentified individuals were listed in the original 42 USC § 1983 complaint, as John/Jane Does #2-4, and have now been idenitifed (See, ¶ 99). Which is the substance of this 'Amended Complaint' pursuant to Rule 15 of the F.R.C.P. and directed by the Honorable Cathy Seibel to be filed by plaintiff no later than June 16, 2025, in her May 2, 2025, decision & Order.

## V. INJURIES:

1. Plaintiff still experiences numbing sensations to his entire left leg and left buttock, shooting needle like sensations to his left leg and into his buttocks.

2. Occassionally, plainitff bowels and urine are released due to the nerve damage without notice, mostly during sleep, and occasionally through out the day.

---

[40] Plaintiff is in possession of a copy of said appeal.

3. Plaintiff experiences erectile dysfunction and has not been able to maintain any sexual relationships without enhancements (Viagra, Cialis).

4. Plaintiff cannot run or jump without experiencing excruciating pains for days afterwards.

5. Plaintiff's wrist (left) remains permanently damaged from the fall in the stairwell (¶ 39, 48) and he cannot extert too much pressure without numbing and lost of sensation.

6. Plaintiff continues to suffer from psychological and emotional trauma when going out to work, family, cultural or religious events and gatherings for fear of not being able to hold his bowels or urine.

7. Plaintiff can not exercise or sit down for long periods of time without experiencing pain or discomfort.

8. The PTSD (Post Traumatic Stress Disorder) associated with being incarcerated and as a survivor of sexual abuse plaintiff suffered as a child and adolescent, has only been exacerbated by the illegal and humiliating strip searches, hostile and retalitory conduct of correctional employees, resulting in anxiety whenever plaintiff interacts with authority figures, law enforcement or correctional staff.

9. Plaintiff can only anticipate that as he ages that his physical and neurological ailments will continue to degenerate as a direct result of the incidents named herein.

## VI. RELIEF

Plaintiff is respectfully requesting compensatory and punitive damages in the following amounts from each [chronologically listed] defendant:

1. Correctional Officer, Clinton Thomas: $100,000.00 (One Hundred Thousand dollars);

2. Correctional Officer, Ceasar Gonzalez: $100,000.00 (One Hundred Thousand dollars);

3. Correctional Sergeant, Thomas Knight: $200,000.00 (Two Hundred Thousand dollars);

37

4. Correctional Officer, Thomas Molloy: $200,000.00 (Two Hundred Thousand dollars);

5. Correctional Officer, V. Marsico: $200,000.00 (Two Hundred Thousand dollars);

6. Correctional Officer, Jasmin Soto: $100,000.00 (One Hundred Thousand dollars);

7. Correctional Officer, Sheryl Davis: $100,000.00 (One Hundred Thousand dollars);

8. Correctional Officer, Jessica Reyes: $100,000.00 (One Hundred Thousand dollars);

9. Former DSH, Latisha Jackson: $300,000.00 (Three Hundred Thousand dollars);

10. DSA, Albert Helms: $300,000.00 (Three Hundred Thousand dollars);

11. Former Supt., Michael Capra: $500,000.00 (Three Hundred Thousand dollars);

12. Program Committee Chairperson, Ms. J. Manuel: $200,000.00 (Two Hundred Thousand dollars);

13. Nurse Practitioner, Shibi Kachappily: $300,000.00 (Three Hundred Thousand dollars);
14. Doctor, Felix Ezekwe: $300,000.00 (Three Hundred Thousand dollars);

15. Doctor, Frederick Parker: $300,000.00 (Three Hundred Thousand dollars);

16. Doctor, Razia Ferdous: $300,000.00 (Three Hundred Thousand dollars);

17. Correctional Sergeant, Mark Larsen: $100,000.00 (One Hundred Thousand dollars);[41]

## PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information and belief that:

(1) The complaint is not being presented for an improper purpose (such as to harrass, cause unnecessary delay, or needlessly increase the cost of litigation);

(2) The claims are supported by existing law or by a nonfrivolous argument to change existing law;

---

[41] The total in compensatory and punitive damages amount to 3.7 million dollars.

(3) The factual contentions have evidentiary support after a reasonable opportunity for further investigation or discovery; and,

(4) The complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied in forma pauperis status in furture cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

_May 31st_
**Dated**

_Sheldon P. Johnson_
**Plaintiff's Signature**

Sheldon _____  P. _____  Johnson _____
**First Name**                          **Middle Initial**              **Last Name**

Riker's Island, 09-09 Hazen Street (G.R.V.C.), Unit 2A, E. Elmhurst, New York 11370_____
**Prison Address**

Date on which I am delivering this complaint to prison authorities for mailing: ~~_____~~

## PLAINTIFF'S VERIFICATION

Plaintiff herein, within this amended complaint, declares "If executed within the United States, its territories, possessions, or commonwealths: "I declare [verify] under the penalty of

perjury [pursuant to 28 U.S.C. §1746], that the foregoing is true and correct. Executed on June 6, 2025.

Plaintiff's Signature,

*Sheldon P. Johnson*

Sheldon P. Johnson, B&C #241-24-00514
Riker's Island County Jail
09-09 Hazen Street (G.R.V.C.), Unit 2A
E. Elmhurst, New York 11370

**NOTARY PUBLIC**

M. Foster
Commissioner of Deeds, City of New York
No. 4-10382
Cert. Filed in Queens County
Commission Expires on 4/1/27

SWORN TO BEFORE ME THIS
31st day of MAY, 2025
M. Foster

40

RECEIVED
JUN 11 2025
U.S.D.C.
W.P.

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK     )
                                         ss.:
COUNTY OF _____ )

_Sheldon P. Johnson_____, being duly sworn, deposes and says:

That I have on this __3__ TH day of __June_____, 20_25_, placed and submitted

in the postal receptacle in the New York City Correctional Facility known as:

_Into The care of NYC Doc Mail Staff at 09-09 Hazen St.,_

_G.R.V.C., Elmhurst, N.Y. 11370_____

a Notice of __Amended Complaint, FRCP 15 (a)____, to be duly mailed via the

United States Postal Service to the following parties in the above action:

_Mr. Robert Feliu, AG_
_Westchester Regional office_
_44 South Broadway, 5th Flr._
_White Plains, N.Y. 10601_

RECEIVED
JUN 11 2025
PRO SE OFFICE

Respectfully submitted,

_Sheldon P. Johnson_

Sworn to before me this
_31_ ST day of _MAY____, 20_25_

_M. Foster_

M. Foster
Commissioner of Deeds, City of New York
No. 4-10382
Cert. Filed in Queens County
Commission Expires on 4/1/27

Sheldon P. Johnson, 341-24-00514
Riker's Island County Jail
09-09 Hazen St. (GRVC)
E. Elmhurst, N.Y. 11370

 

**Retail**

U.S. POSTAGE PAID
USPS Ground Advtg
ASTORIA, NY 11103
JUN 09, 2025

10601    **$9.45**

RDC 01    1 Lb 3.10 Oz    S2324M503666-08





RECEIVED
JUN 11 2025
U.S.D.C.
W.P.

Attention: Pro-Se Litigation Unit
Honorable Cathy Seibel, USDJ
For The Southern District of New York
300 Quarropas Street
White Plains, N.Y. 10601

RECEIVED
JUN 11 2025
PRO SE OFFICE

USPS TRACKING® #

9534 6143 6726 5160 7749 25

LEGAL MAIL: Priviledged Correspondence